# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVERI DEVELOPMENT GROUP, )
LLC, an Illinois limited liability )
corporation; NORTH/NORTHWEST )
SUBURBAN TASK FORCE FOR )
INDIVIDUALS WITH MENTAL )
ILLNESS, an Illinois not-for-profit )
corporation; LYNN CRIPE; and )
DAVID ELLERMAN, )                         12 C 7419
                        )
        **Plaintiffs,** )                         **Judge John Z. Lee**
                        )
       **v.** )
                        )
VILLAGE OF WHEELING, )
                        )
       **Defendant.** )

## MEMORANDUM OPINION AND ORDER

Plaintiff Daveri Development Group, LLC ("Daveri") submitted an application to the Defendant Village of Wheeling ("Wheeling") to obtain zoning approval for an apartment building for individuals with mental disabilities who are capable of living independently. Wheeling denied the application citing zoning concerns. As a result of the denial, Daveri, along with Plaintiffs North/Northwest Suburban Task Force for Individuals with Mental Illness ("Task Force"), Lynn Cripe, and David Ellerman, have sued Wheeling for disability discrimination pursuant to the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3604(f)(1)(B), (f)(2)(B), (f)(3)(B) (Count I), the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(7) (Count II), the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794(a) (Count III), and under Illinois law for mandamus (Count IV). Plaintiffs now seek a preliminary injunction ordering Wheeling's Board of Trustees to provide zoning approval for the project and directing Wheeling's zoning administrator to issue a letter confirming the

approval for use in Daveri's efforts to obtain financing for the project.

The parties have provided numerous briefs and countless exhibits in support of and in opposition to the motion. In addition, the Court conducted a two-day hearing during which the parties submitted yet more exhibits and testimony from a number of witnesses; after the hearing, they submitted additional briefs and exhibits. After considering all of the submissions, the Court finds that Plaintiffs have demonstrated a sufficient likelihood of success on the merits to satisfy their threshold burden as to this element of the preliminary injunction test. Under the facts of this case, however, the Court finds that Plaintiffs have failed to establish that they would suffer irreparable harm or that they would lack an adequate remedy at law if an injunction were not to issue at this time. Accordingly, for the reasons set forth herein, Plaintiffs' motion for preliminary injunction is denied.

## Facts

This case pits Daveri, which embraces, albeit for profit, the laudable goal of providing permanent supportive housing for the mentally disabled against the Village of Wheeling, which is duty-bound to enforce its Zoning Code in accordance with the law. Daveri, a Chicago-based housing developer, is no stranger to denials by municipalities of its proposals to build housing for disabled individuals as demonstrated by the vociferous opposition it has encountered in other municipalities.

In 2011, Daveri and Task Force, a not-for-profit corporation that seeks housing and services for persons with chronic mental disabilities, began working with the Wheeling Planning Commission to develop permanent supportive housing for mentally disabled adults on Hintz Road in Wheeling ("PhilHaven"). Permanent supportive housing is a residential housing model that links affordable, independent, long-term housing with access to social services.

PhilHaven's proposed site on Hintz Road currently sits vacant because a residential housing development approved by Wheeling in 2006 ("the Hintz Pointe project") was never constructed. The Hintz Pointe project was equivalent in size to PhilHaven, but was a higher density, multi-family development that was not planned for mentally disabled individuals.

Daveri hired Goodman Williams Group to perform a study ("GWG Study") that assessed the need for permanent supportive housing such as PhilHaven in Wheeling. Both Plaintiffs and Wheeling offered this study in evidence during the hearing. The GWG Study estimates that there are approximately 992 adults with severe mental disabilities in need of permanent supportive housing within a five-mile radius of the PhilHaven site, and approximately 1,996 adults with severe mental disabilities in need of permanent supportive housing within a five to ten-mile radius of the site. Wheeling has no other permanent supportive housing for the mentally disabled.

In 2012, Daveri entered into a partnership to construct PhilHaven with two not-for-profit mental health service providers, The Kenneth Young Center ("KYC") and the Alexian Brothers Health System ("Alexian"), neither of which is a party to this lawsuit. KYC and/or Alexian will provide each PhilHaven tenant with a treatment plan and a case worker to assist the tenant in accessing available social services. Plaintiffs Lynn Cripe[1] and David Ellerman[2] are mentally disabled individuals, who wish to apply for an apartment at PhilHaven if and when it is built.

---

[1] Cripe, who has been diagnosed with major depression and bipolar disorder, lives in a Transitional Living Program ("TLP") facility with Alexian Brothers. She is capable of living independently. Although she does not drive, the TLP's van service meets her transportation needs. Cripe is eligible to apply to live at PhilHaven and intends to do so if it is an option.

[2] Ellerman, who has been diagnosed with major depression, bipolar disorder, anxiety attacks, and chronic pain, has lived in an Alexian Brothers TLP facility since August 2011. Due to the two-year time limit for living in a TLP, however, Ellerman will be forced to find a new residence after August 2013. He is capable of living independently, and PhilHaven is a place where he would like to live. Ellerman is eligible to apply to live at PhilHaven and intends to do so if it is an option.

PhilHaven is designed to be an apartment complex, and each of PhilHaven's tenants will have a right of tenancy. On-site supervision and on-site medical care are not necessary because only disabled persons capable of living independently are eligible to live at PhilHaven. Persons with a felony or violent history will be ineligible to live at PhilHaven. If built, PhilHaven will contain fifty dwelling units, including thirty-one one bedroom, thirteen two-bedroom, and six three-bedroom units. PhilHaven would not be tax-exempt and thus would contribute more to the Village's tax rolls than the vacant property that now exists at the proposed PhilHaven location.

The Village of Wheeling receives federal financial assistance and is an Illinois home rule municipal corporation governed by a Board of Trustees that consists of seven elected members including the President. A housing developer seeking to build in Wheeling must first file an application for approval with Wheeling's Planning Commission, which reviews the site plan and all of the plans and uses related to the proposed development. After such review, the Planning Commission approves or denies the petition. If a petition is approved, the Plan Commission recommends action to the Board of Trustees. After it receives the Plan Commission's recommendation, the Board of Trustees then reviews the application and provides a public hearing. The proposal is then put to vote, and a majority of the Board may approve, conditionally approve, or deny the application.

On February 16, 2012, Daveri submitted its first application for approval for the PhilHaven project seeking: (1) site plan approval; (2) a variance to permit Daveri to reduce the number of parking spaces from the required 138 to 56 and to waive the requirement of one covered parking stall for each unit; and (3) a text amendment to establish that a multiple-family dwelling in an R-4 district – the zoning district in which the site is located – may include limited office space for provision of support services. Daveri sought the text amendment not because

Daveri believed it was necessary, but because the plan included office space and the Planning Commission required it.

On March 8, April 12, and April 26, 2012, the Planning Commission held public hearings with respect to the first application, after which it recommended that the Board of Trustees approve it. On May 21, 2012, the Board denied the application on the basis that the requested parking variance was too drastic and that PhilHaven's provision of on-site services was not permitted in an R-4 residential district.[3]

By way of background, Wheeling's Zoning Code designates five residential districts, identified as R-1, R-2, R-3, and R-4. R-1, R-2, and R-3 districts are designated for single-family dwellings. R-4 is the only residential district in which multiple-family dwellings are allowed,[4] and PhilHaven's proposed site is located in an R-4 district. The R-4 residential district was established to stabilize and conserve existing neighborhoods that predominantly consist of multiple-family dwellings built at moderate to high density. (Joint Ex. A, Zoning Code, Ch. 19.04.060.) The term "multiple-family dwelling," in turn, is defined in the Zoning Code as "[a] building containing three (3) or more dwelling units whose residents live independently of one another." (*Id.* Ch. 19-01.) "Dwelling unit" is defined as "a structure or portion thereof designed and built as a complete, self-sufficient living facility for one family, including permanent provisions for sleeping, eating, cooking and sanitation" and do not include "[u]nits in a hotel or motel." (*Id.*)

On May 31, 2012, Daveri submitted its second application for approval of an amended site plan for PhilHaven to address the concerns raised by the Board in the prior hearing. Daveri's second application did not request the zoning variance for parking and its amended site plan

---

[3] Daveri's first application and its denial are not the subject of the instant litigation.
[4] Multiple-family dwellings are also permitted uses in each of the mixed-use districts (identified as MXC Commercial-Residential, MXT Transit-Oriented, MXO Open-Space Residential, and MXI Industrial).

complied with the existing parking and covered stall requirements. The second application also eliminated the need for a text amendment because the amended site plan did not include any office space within the facility. The Planning Commission unanimously recommended approval of the project as amended. Nonetheless, on July 16, 2012, the Board once again voted against the PhilHaven project.

The Board denied Daveri's second application because the Board believed that PhilHaven would be a facility that would provide social services and, thus, constituted a "social service facility," which is not permitted in an R-4 district. A "social service facility" is defined by Wheeling's Zoning Code as a

> facility operated by an organization which provides services such as training, counseling, health or the distribution of food or clothing. This term includes, but is not limited to, a facility offering life skills training, substance abuse counseling, housing services or a neighborhood recovery center. This term does not include an emergency residential shelter.

(Jt. Ex. A, Zoning Code, Ch. 19-01.)

A social services facility may be located in the following districts so long as a special use permit is approved by the Board of Trustees: B-1 Planned Shopping Center; B-3 General Commercial and Office; MXT Transit-Oriented Mixed Use; MXI Mixed Use Industrial; and MXC Commercial-Residential Mixed Use. Additionally, the Zoning Code categorizes a social service facility within the use category of "health care and social assistance." Other facilities included in this use category are: medical offices providing outpatient care (such as dental and chiropractic offices and similar facilities); health clinics; hospitals; medical research laboratories; medical service facilities; and nursing homes. "Special use" is defined as a "use that would not be appropriate generally or without restriction throughout the zoning district but which, if controlled as to number, area, location, or relation to the neighborhood, would not be detrimental

to the public health, safety, or general welfare." (*Id.*) According to the Board, because PhilHaven's proposed site is located in an R-4 district and it qualified as a "social services facility," the Zoning Code prohibited PhilHaven from being built at the Hintz Road site.

The current motion was precipitated by Daveri's application to the Illinois Housing Department Authority ("IHDA") for low-income housing tax credits to fund PhilHaven submitted on July 30, 2012. Every year, the federal government allocates to each state a certain amount in federal low-income housing tax credits. Low-income housing tax credits are created by the U.S. Treasury and the Internal Revenue Service as a means of providing private equity capital to be used in conjunction with the creation of regulated affordable housing. IHDA is the allocating agency for the State of Illinois and disburses the tax credits through an application process.

In Illinois, there are two award opportunities per year for low-income housing tax credits. Daveri's July 2012 application failed to meet IHDA's mandatory zoning approval requirement because Daveri did not provide a letter of zoning approval from Wheeling at the time its application was submitted. In order to be awarded low-income housing tax credits at the next available opportunity, Daveri's completed application, which must include a zoning approval letter, is due to the IHDA by March 22, 2013. If Daveri does not obtain a letter of zoning approval from Wheeling by that date, there is a second award opportunity later in 2013. If it is not awarded the tax credits, Daveri would have to find another funding source for PhilHaven, and the building of PhilHaven would likely be delayed.

Plaintiffs Ellerman and Cripe are individuals who suffer from disabilities; both would benefit from the permanent supportive housing that PhilHaven is intended to provide. Furthermore, there are long waiting lists for other permanent supportive housing facilities in the

area. Ellerman and Cripe's limited term of residency at a transitional living program facility will expire in August 2013 and October 2013, respectively, and after that point, they will need to find housing elsewhere.

## Discussion

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008).

"To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements." *Id.* at 1086. First, the movant must show "that its claim has some likelihood of succeeding on the merits." *Id.* Second, the movant must establish "that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims." *Id.* Third, the movant must show "that traditional legal remedies would be inadequate." *Id.* "If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction." *Id.* Only if the moving party has satisfied each of the threshold phase requirements, will the court enter the balancing phase of the analysis. *Id.*

## I.    Likelihood of Success on the Merits

To satisfy the likelihood of success element of the threshold phase, Plaintiffs must "demonstrate a better than negligible likelihood of success on the merits of its claims." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp.*, 128 F.3d 1111, 1114 (7th Cir. 1997). As the Court of

Appeals has recognized, "[t]his is an admittedly low requirement." *Girl Scouts of Manitou Council,* 549 F.3d at 1096.

Plaintiffs have sued for disability discrimination under the FHAA, the ADA, and the Rehabilitation Act. These statutes are "broad mandate[s] to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Bronk v. Ineichen,* 54 F.3d 425, 428 (7th Cir. 1995) (discussing the FHA); *see Wis. Cmty. Servs., Inc. v. City of Milwaukee,* 465 F.3d 737, 746 (7th Cir. 2006) (discussing the FHA and ADA).

The FHAA provides that "it shall be unlawful . . . to otherwise make unavailable or deny . . . a dwelling to any . . . renter because of a handicap of . . . that . . . renter." 42 U.S.C. § 3604(f)(1)(A). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" 42 U.S.C. § 12132. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." [5] 29 U.S.C. § 794(a). Claims under all three statutes apply to municipal zoning decisions. *Wis. Cmty. Servs.,* 465 F.3d at 746, 750; *Oconomowoc Residential Programs v. City of Milwaukee,* 300 F.3d 775, 782 (7th Cir. 2002).

A plaintiff may prove a violation of the FHAA, ADA or Rehabilitation Act by showing (1) disparate treatment, (2) disparate impact, or (3) a refusal to make a reasonable accommodation. *Nikolich v. Vill. of Arlington Heights,* 870 F. Supp. 2d 556, 562-66 (N.D. Ill. 2012); *A.B. ex rel. Kehoe v. Hous. Auth. of South Bend,* No. 3:11 CV 163 PPS, 2012 WL 1877740, at *4 (N.D. Ind. May 18, 2012); *see Wis. Cmty. Servs., Inc. v. City of Milwaukee,* 465

---

[5] The parties have stipulated that Wheeling receives federal funding and the Rehabilitation Act applies.

F.3d 737, 746-53 (7th Cir. 2006) (discussing reasonable accommodation under the three statutes). Generally, the same analysis applies to a plaintiff's theory of recovery under the three statutes. *Nikolich*, 870 F. Supp. 2d at 562.

## A.    Disparate Treatment

There are two types of disparate treatment cases:  ones that involve a facially discriminatory policy, and ones that involve more typical individualized decision-making. *Reidt v. Cnty of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir. 1992); *In re Pan American World Airways, Inc.*, 905 F.2d 1457, 1460 (11th Cir. 1990); *Burlew v. Eaton*, 869 F.2d 1063, 1065 n.4 (7th Cir. 1989).   Here, Plaintiffs argue that Wheeling has engaged in disparate treatment of qualified individuals with a disability by enacting a facially discriminatory zoning policy and by denying Daveri's application to build PhilHaven in a residential district zoned for multi-family dwellings.  The Court addresses each in turn.[6]

First, Plaintiffs argue that Wheeling's Zoning Code is facially discriminatory toward disabled persons.  "A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "Except in the First Amendment context, facial challenges to statutes are disfavored." *Oconomowoc Residential Programs v. City of Milwaukee*, 23 F. Supp. 2d 941, 951 (E.D. Wis. 1998).

Wheeling's Zoning Code defines a "social service facility" as a "facility operated by an organization which provides services such as training, counseling, health or the distribution of food or clothing."  Under the Code, the term social service facility "includes, but is not limited

---

[6] Unfortunately, the parties fail to provide any binding authority articulating the standard by which courts in this Circuit should analyze disparate treatment claims in municipal zoning cases.  Accordingly, where appropriate, the Court determined the proper legal standards to apply in this case on its own accord.

to, a facility offering life skills training, substance abuse counseling, housing services or a neighborhood recovery center." Medical offices, health clinics, hospitals, medical research laboratories, medical service facilities, and nursing homes are all categorized as social service facilities.

Plaintiffs have failed to establish that "no set of circumstances exists" under which excluding social service facilities from residential zoning districts would be valid. Wheeling has a legitimate and rational interest in excluding social service facilities such as clinics, doctors' offices, and hospitals from residential zoning districts. Such facilities would significantly impact the residential nature of the neighborhoods in those districts due to the traffic patterns associated with such businesses. Accordingly, the Court holds that Plaintiffs have much less than a negligible chance of succeeding in their facial challenge to Wheeling's Zoning Code.

Second, Plaintiffs argue that the Board's individualized denial of the application to build PhilHaven constituted disparate treatment of disabled persons. The elements of disparate treatment under the Rehabilitation Act, ADA, and FHA are similar to the elements used to establish employment discrimination. *Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir. 1995) (Rehabilitation Act); *Kormoczy v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823 (7th Cir. 1995) (FHA); *Smith v. Hous. Auth. of S. Bend*, 867 F. Supp. 2d 1004, 1016 (N.D. Ind. 2012) (ADA). *But see Washington v. Ind. High Sch. Athl. Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999) (stating that "the Rehabilitation Act requires that the exclusion be solely by reason of disability, while the ADA requires only that the exclusion be by reason of the disability.") "Disparate treatment involves a showing of intentional discrimination, provable via either direct or circumstantial evidence." *Nikolich*, 870 F. Supp. 2d at 562.

Here, Plaintiffs rely solely on circumstantial evidence to support their claim of intentional

discrimination. (*See* Pls.' Mem. Supp. Mot. Prelim. Inj. 11-13.) Where plaintiffs alleging

housing discrimination rely on circumstantial evidence to establish disparate treatment, the

district court employs the familiar burden-shifting analysis under *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-03 (1973). *East-Miller v. Lake Cnty. Hwy. Dep't*, 421 F.3d 558, 563

(7th Cir. 2005); *Allen v. Muriello*, 217 F.3d 517, 520 (7th Cir. 2000); *Kormoczy*, 53 F.3d at 823-

24; *see Lindsay v. Yates*, 578 F.3d 407, 415 (6th Cir. 2009); *Gamble v. City of Escondido*, 104

F.3d 300, 305 (9th Cir. 1997). For example, in *Hamilton v. Svatik*, the Seventh Circuit held that

a plaintiff claiming race discrimination in housing under the FHA "establishes a prima facie case

by showing that 1) she belongs to a minority; 2) the defendant was aware of it; 3) the plaintiff

was ready and able to accept defendant's offer to rent; and 4) the defendant refused to deal with

her." 779 F.2d 383, 387 (7th Cir. 1985); *see Flores v. Vill. of Bensenville*, No. 00 C4905, 2003

WL 1607795, at *4 (Mar. 26, 2003), *aff'd*, 153 Fed. Appx. 384 (7th Cir. 2005).[7] "The

employee's burden of satisfying the four elements of a prima facie case is not onerous; rather, a

prima facie showing is 'quite easy to meet.'" *Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, (7th Cir.

1995) (quoting *Tex. Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Once the

plaintiff establishes a prima facie case of housing discrimination, the burden of production shifts

to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Flores*, 2003

WL 1607795, at *4. Then, the plaintiff must prove by a preponderance of the evidence that the

---

7 The Court notes that in *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294
F.3d 35, 39 (2nd Cir. 2002), the Second Circuit required that, to establish a prima facie case of FHA and
ADA discrimination, a plaintiff "must present evidence that animus against the protected group was a
significant factor in the position taken by the municipal decision-makers themselves or by those to whom
the decision-makers were knowingly responsive." *Id.* (quotation omitted). *But see Mitchell v. Shane*, 350
F.3d 39, 47 (2d Cir. 2003) (applying four-factor prima facie case in an FHA housing discrimination case).
Additionally, the Second Circuit required that to establish a prima facie case of Rehabilitation Act
discrimination, a plaintiff "must show that the defendants denied the permit solely because of the
disability." *Reg'l Econ.*, 294 F.3d at 39. Given this Court's findings and conclusions as stated in this
Memorandum Opinion and Order, the Court finds that Plaintiffs have satisfied the likelihood of success
requirement under either test.

defendant's asserted reason is a pretext for discrimination. *Id.* Applying *Hamilton* to the instant case, the Court holds that Plaintiffs Daveri, Ellerman, and Cripe have satisfied the elements of a prima facie case. Each will be discussed in turn.[8]

Plaintiffs have shown that they will likely satisfy the first element of the prima facie case because Ellerman and Cripe both suffer from substantial mental disabilities that limit their major life activity of working. (2/15/13 Hr'g Tr. 72-73 (Ellerman); Pls.' Ex., Cripe Dep. at 10.) Furthermore, Daveri, as a builder and developer of permanent supportive housing for the mentally disabled, and Task Force, as housing and services advocate for the mentally disabled, have a relationship or association with persons such as Ellerman and Cripe. (Pls.' Ex. A-6, 5/21/12 Plan Committee Meeting Minutes at 9 (Village President Abruscato).) *See Warth v. Seldin*, 422 U.S. 490, 505-06 (1975) (requiring for standing purposes that zoning restrictions were applied to plaintiffs' particular projects that would supply housing to protected class); *Wis. Comm'y Servs. v. City of Milwaukee*, 465 F.3d 737, 746-53 (2006) (operator of mental health clinic sued municipality under ADA and Rehabilitation Act for denial of permit to move clinic to new location); *Gorski v. Troy*, 929 F.2d 1183, 1189 (7th Cir. 1991) ("a plaintiff suing pursuant to the FHA need not be a member of the class that was the object of discrimination to satisfy the injury-in-fact requirement"); *Oak Ridge Care Ctr., Inc., v. Racine Cnty.*, 896 F. Supp. 867, 872 (E.D. Wis. 1995) (stating ADA and FHA protects an entity with whom a disabled individual has a known relationship or association).

Plaintiffs are likely to satisfy the second element because they have established that Wheeling was aware of the above facts. The minutes of the Board's July 16, 2012, meeting clearly establish that the Board was aware that PhilHaven's tenants would be mentally disabled.

---

8 For the reasons discussed below, the Court finds that Plaintiff Task Force has not satisfied the prima facie case.

(Pls.' Ex. A-6, 7/16/12 Board Meeting Minutes at 3-5.)

The third element is also likely to be satisfied because Daveri has shown that it is ready, willing, and able to proceed with PhilHaven if zoning approval were provided, and Ellerman and Cripe have shown that they would apply to live at PhilHaven, if and when it is completed. Daveri's readiness and ability to proceed with the PhilHaven project are evidenced by its detailed application to Wheeling that included specific plans detailing PhilHaven's siting, signage, tree inventory, architecture, building elevations, carports, materials, geometrics, grading, utilities and photometrics. (Pls.' Ex. A-5, Proposed Ordinance No. 4709.) Daveri has invested more than $75,000.00 in this project and has been developing PhilHaven for over a year. (Berzac Decl. ¶ 13.) As for the individual Plaintiffs, Ellerman and Cripe testified that they are only allowed to reside at their current TLP facility for a limited time and stated that they are ready and willing to apply to live at PhilHaven when the facility becomes available. (2/15/13 Hr'g Tr. 74 (Ellerman); Pls.' Ex., Cripe Dep. at 13-14.) The Court finds that Task Force, however, has not shown a likelihood of success in satisfying the third element of a prima facie case because it is unclear how the zoning approval of the project would affect it, if at all.

Lastly, the fourth element is satisfied by Plaintiffs because it is undisputed that the Board of Directors denied Daveri's application to build PhilHaven at the proposed site. (Pls.' Ex. A-6, 7/16/12 Board Meeting Minutes at 7-8.) On July 16, 2012, the Board voted against PhilHaven with President Abruscato voting in favor of PhilHaven and Trustees Argiris, Brady, Heer, Hein, Lang, and Vogel voting against it. (*Id.* at 8.)

Because Plaintiffs have demonstrated a likelihood of success in establishing a prima facie case of housing discrimination, the burden of production shifts to Wheeling to articulate a legitimate, nondiscriminatory reason for its action. A brief review of the history of Daveri's

first and second application would be helpful at this point.

In February 2012, Daveri submitted its first application for approval of PhilHaven. It sought approval of its site plan, a variance to reduce the number of parking spaces and to waive the covered parking stall requirement, and a text amendment (at the Planning Commission's insistence) allowing a multiple-family dwelling in an R-4 residential district to have office space for support services. The Board voted against Daveri's first application because the variance in parking was too drastic and the provision of on-site services precluded PhilHaven from being built in a residential district. Daveri then submitted its second application, which fully complied with the existing parking requirements and did not seek office space because the revised project plan did not call for any on-site services. Despite these revisions, the Board nevertheless voted against the application.

Wheeling states that Daveri's second application was denied because PhilHaven is a social service facility, which is not permitted in a multi-family dwelling residential district. At the hearing, the Board members' overarching concern permeating the discussion was that social services were going to be provided to PhilHaven tenants on-site. Trustees Kenneth Brady, Dean Argiris, Ray Lang, and David Vogel expressed their disbelief in Daveri's representation that no such services would be provided, and they pointed to Daveri's previous application that included on-site offices. (Def.'s Ex. C-12, 7/16/12 Bd. Mtg. Tr. 84, 100, 109-10.) In addition, Trustees Brady and Lang stated that because there would be a live-in resident manager with a property management background and property management and leasing staff periodically servicing the property, PhilHaven qualified as a social service facility. (*Id.* 81-82, 110.)[9]

Plaintiffs argue that Defendant's proffered reason for denying Daveri's application is a

_____

9 Although Trustee Hein read the definition of social service facility into the record, he did not explain his reasoning for finding that PhilHaven fit the definition. (*Id.* 91-93.)

15

pretext for disability discrimination. "The defendant's evidence of a good reason for refusing to deal with the plaintiff 'must be devoid of circumstances from which it can be inferred that there was a real though subtle purpose of discrimination.'" *Hamilton*, 779 F.2d at 387 (quoting *Kaplan v. 442 Wellington Coop. Bldg. Corp.*, 567 F. Supp. 53, 56 (N.D. Ill. 1983)). Plaintiffs may establish pretext by showing that the proffered reason had no basis in fact, did not actually motivate the denial, or was insufficient to motivate the denial. *See Malacara v. City of Madison*, 224 F.3d 727, 733 (7th Cir. 2000).

First, Plaintiffs contend that PhilHaven is not a "social services facility" because all of the social service facilities in the health care and social assistance use category (such as doctor's offices, clinics, and hospitals) provide services on-site, whereas tenants of PhilHaven will receive social services at various facilities that are located offsite, such as the offices of the tenant's service provider. It is possible, Plaintiffs concede, that a PhilHaven tenant could arrange an in-home visit by a service provider. However, Plaintiffs argue that it is also possible that any tenant of a multi-family dwelling could do so as well (for example, a tenant could seek the in-home assistance of a nurse care practitioner or a part-time caregiver), and Wheeling has not shown similar concern for the private conduct of non-disabled tenants in other multi-family dwellings.

Second, Plaintiffs argue that the very fact that the Board expressed disbelief that services would not be provided on-site evidences an unfounded and prejudicial belief that mentally disabled individuals are simply incapable of living independently under any circumstances and indicates pretext. In fact, at the July 16, 2012, Board Meeting, Wheeling Trustees repeatedly voiced their incredulity that on-site services would not be provided by Alexian and KYC at PhilHaven. (*See, e.g.*, Def.'s Ex. C-12, 7/16/12 Bd. Mtg. Tr. 99 (Trustee Argiris stating there is

no difference between Daveri's first and second application). *Cf.* 2/15/13 Hr'g Tr. 186-87 (Def.'s expert, Norbert Pointner, stating that multi-family dwellings involve independent living and assuming that tenants at PhilHaven could not live independently).) But Daveri has consistently stated at every point and turn that, as a precondition to becoming a tenant of PhilHaven, individuals are required to demonstrate that they are capable of living independently. (Joint Ex. D, 3/8/12 Planning Commission Meeting Tr. 12, 53, 60, 84, 85, 86 (emphasizing that potential PhilHaven tenants are already living in independent apartment buildings, *i.e.*, transitional living facilities), 87, 95, 107, 111, 230-31; Joint Ex. E, 4/12/12 Planning Commission Meeting Tr. 29, 35, 39, 40, 60, 117; Def.'s Ex. C-12, 7/16/12 Vill. Bd. Meeting Tr. 79, 80, 86, 98, 114.) Furthermore, although the Board cites to the inclusion of on-site offices in Daveri's original application to support its position, the only reason Daveri included on-site office space was because Wheeling's Planning Commission required it. (Pls.' Ex., Berzac Decl. ¶ 7; Pls.' Ex. Pusateri Dep. at 41; Def.'s Ex. C-12, 7/16/12 Vill. Bd. Meeting Tr. 106.)

As for Daveri's second application, any on-site presence of services was limited to a live-in resident manager with general property management experience and property management and leasing staff that periodically services the property. (Def.'s Ex. C-12, 7/16/12 Vill. Bd. Meeting Tr. 76, 79-81, 83.) There is no requirement that the resident manager have any specialized training or certification needed for the treatment of individuals with mental disabilities. (*Id.*) Given the record before the Court, Plaintiffs have raised doubts that the Board's proffered reasons for denying Daveri's second application had a basis in fact, actually motivated the decision, or were sufficient to motivate the decision. Instead, the Board's incredulity appears to be predicated upon an irrational and unsupported perception that mentally disabled adults are categorically incapable of living independently without substantial on-site

services.[10] (*See* 2/19/13 Hr'g Tr. 253 (Trustee Brady testifying that PhilHaven differs from a multi-family dwelling because typical tenants of a multi-family dwelling "don't have to have any applications or special needs to live in there."); *see id.* 263 ("Q. But the difference is that . . . everyone in PhilHaven is disabled, is that correct? A. Yes.").)

Additionally, the Board claimed at the hearing that it was denying the application because PhilHaven was a safety issue. This too is unsupported and suggests improper discriminatory animus. In explaining his vote, Trustee Argiris stated that building on "Hintz Road is a safety issue." (*Id.* 101.) To the extent that Trustee Argiris was concerned about traffic congestion or density issues, his statement is belied by the fact that, in June 2008, Trustee Argiris and the Board approved a larger housing development with a thirty-unit condominium and three six-unit townhomes for the same site. (Joint Ex. S, Legislative Cover Memorandum; *see* Def.'s Ex. C-12, 7/16/12 Vill. Bd. Meeting Tr. 107 (Mr. Friedland stating on behalf of Daveri: "But it certainly was appropriate for this Board to approve a residential development with more units previously. I mean, Hintz Road hasn't gotten worse in the last year. Has it suddenly become the most dangerous road in town?")

Furthermore, Plaintiffs point to the fact that there was substantial public opposition to PhilHaven at the public hearings based on gross generalizations about the mentally disabled. (Pl.'s Ex. A, Berzac Decl. ¶ 8; Pl.'s Ex. F, Schultz Decl. ¶ 4. *See generally* Joint Ex. D, 3/8/12 Planning Commission Meeting Tr.; Joint Ex. E, 4/12/12 Planning Commission Meeting Tr.;

---

10 To the extent that Defendant relies on the 6/18/12 Memorandum of Understanding between Daveri, KYC, and Alexian to show that on-site services will be provided (*see* Def.'s Ex. H, MOU, Recitals ¶ E), the Court credits Mitch Bruski's testimony that any on-site services would only occur at the request of a tenant in his or her apartment rather than in a common area due to privacy issues. (2/15/13 Hr'g Tr. 132, 152.) To the extent that Defendant also relies on Daveri's 7/6/12 Affordable Housing Program application (*see* Def.'s Ex. I, Ex.1, Project Description) to establish the same proposition, the Court finds that Daveri consistently represented, with regard to its first and second application, that there would be one live-in support staff that would have a property management background. (Def.'s Ex. C-12, 7/16/12 Bd. Mtg. Tr. 81-82, 110.)

Def.'s Ex. C-12, 7/16/12 Vill. Bd. Meeting Tr.) It is not unreasonable to think that such vocal opposition may have had an influence, however slight, on the elected officials on the Board, a number of whom are up for re-election in April 2013. (Pl.'s Ex. F, Schultz Decl. ¶ 4.) *See Lauer Farms, Inc. v. Waushara Cnty. Bd. of Adjustment*, 986 F. Supp. 544, 556 (E.D. Wis. 1997) (stating "a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decision-making process"); *Contreras v. City of Chi.*, 920 F. Supp. 1370, 1398 (N.D. Ill. 1996) ("The critical inquiry in such cases must be whether the elected official is appropriately responding to a legitimate concern or is unlawfully catering to and effectuating the constituent's bigotry.")

Given these facts, the Court holds that Plaintiffs have demonstrated, at minimum, a better than negligible likelihood of success on the merits of their disparate treatment claims under the Rehabilitation Act, ADA, and FHA.

### B. Disparate Impact

Next, Plaintiffs argue that even if they were unable to establish disparate treatment, Wheeling's conclusion that PhilHaven is not a multi-family dwelling has a disparate impact on disabled persons. As a preliminary matter, Defendant argues that Plaintiffs have waived their disparate impact claim because they did not plead it as a separate claim in their complaint. The Court disagrees. "Although *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* require that a complaint in federal court allege facts sufficient to show that the case is plausible, they do not undermine the principle that plaintiffs in federal courts are not required to plead legal theories." *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) (citations omitted). Plaintiffs' disparate impact claim is properly before the Court.

"Disparate impact, unlike disparate treatment, does not require that an individual be

treated less favorably because of a protected characteristic, but rather calls for proof that a facially neutral policy unjustifiably falls more harshly on a protected group than on others." *Nikolich v. Vill. of Arlington Heights*, 870 F. Supp. 2d 556, 563 (N.D. Ill. 2012). To determine whether a facially neutral policy has a disparate impact on those with a protected characteristic, a court considers the following four factors: (1) whether the plaintiff has made a strong showing of a discriminatory effect; (2) whether there is some evidence of discriminatory intent, albeit not enough to satisfy the disparate treatment standard; (3) what is the defendant's interest in taking the action of which plaintiff complains; and (4) whether the relief sought requires the defendant to affirmatively provide housing for members of a protected group or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. *Metro. Hous. Dev. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977). In order to effectuate the purposes of the FHA, "we must decide close cases in favor of integrated housing." *See id.* at 1294.

First, Plaintiffs have shown that Wheeling's conclusion that PhilHaven is not a multi-family dwelling bars it from being located in any residential zoning district, and this has a discriminatory effect on predominantly mentally disabled persons. In order to be a tenant at PhilHaven, each applicant must establish that he or she has a mental disability, is able to live independently, and satisfies other qualifying background characteristics. (Pl.'s Ex. A, Berzac Decl. ¶¶ 4, 8.) Given the Board's rationale for denying Daveri's second application, no permanent supportive housing development for the mentally disabled would ever qualify as a multi-family dwelling or be permitted in a residential district in the Village of Wheeling. Any permanent supportive housing development would, instead, be relegated to industrial, commercial, or mixed use districts that exist primarily on the fringes and outskirts of the Village.

Given that the Board's determination that PhilHaven is a social services facility and not a multi-family dwelling has an adverse impact on a significantly greater percentage of mentally disabled people in the area than on non-mentally disabled persons, Plaintiffs have made a showing of discriminatory effect.

Further, Plaintiffs argue that by allowing nursing homes in all residential areas, including R-4 districts, but not residences like PhilHaven, Wheeling's interpretation of its Zoning Code has a disparate impact on mentally disabled persons who are able to live independently. Wheeling's expert, Norbert Pointner, explained that the reason why Wheeling allows nursing homes in residential districts is that people in nursing homes have "very little interaction with adjacent land uses or with the overall community" while tenants of PhilHaven will "interact with the community." (2/15/13 Prelim. Hr'g Tr. 188-89.) Such statements tend to show that the rationale behind the Zoning Code is based, at least in part, on assumptions that disabled persons who are capable of living independently (albeit with access to social services) should be discouraged from interacting with the community at large. (*Id.* 189.)[11]

In response, Wheeling argues that its interpretation of its Zoning Code is for the good of PhilHaven's tenants because the zoning districts in which social services facilities are permitted are closer to the amenities that disabled residents would likely need. This rationale, however, is belied by the fact that there is a grocery store within a four-minute walk from PhilHaven on Hintz Road and a bus stop nearby on Hintz Road. (Pl.'s Ex. F, Goodman Williams Site and Market Study at 11. *Compare id.*, *with* Demonstrative Ex. Official Zoning Map.) Because Plaintiffs have shown that Wheeling's actions and practices as to PhilHaven have had a

---

[11] Plaintiffs also point out that whatever concerns the Board may have as to congestion and traffic patterns are more severe when it comes to nursing homes because such facilities hire a number of health care professionals and treatment providers who must commute to and from the facility on a 24/7 basis.

discriminatory effect on the mentally disabled, the first factor favors a finding of disparate impact.

Second, as discussed above, the Court finds that there is some evidence of discriminatory intent. Although Wheeling's Zoning Code as to social service facilities is facially neutral, Plaintiffs have raised numerous issues regarding the Board's application of the zoning plan to deny Daveri's proposal and whether such action evidences an intent to preclude the inclusion of mentally handicapped persons capable of living independently in the greater community.

Third, the Court must determine Defendant's interest in taking the action of which Plaintiffs complain. "[I]f the defendant is a governmental body acting within the ambit of legitimately derived authority, we will less readily find that its action violates the Fair Housing Act." *Metro. Hous. Dev.*, 558 F.2d at 1293. However, "if the defendant is a governmental body acting outside the scope of its authority or abusing its power, it is not entitled to the deference which courts must pay to legitimate governmental action." For example, where there is evidence that suggests that the action of the governmental body was "merely a device, intentional or otherwise," to force FHA-protected class members from the municipality, the action of a governmental body is not entitled to deference. *See Gomez v. Chody*, 867 F.2d 395, 403 (7th Cir. 1989).

Here, the State of Illinois authorizes Wheeling to interpret its zoning ordinance. *See* 65 Ill. Comp. Stat. 5/11-13-5. Wheeling's interest in denying Daveri's second application was to exclude anything it deemed a "social service facility" from residential districts. However, as discussed above, Plaintiffs have presented evidence to support their contention that Wheeling's denial was based, at least in part, on a discriminatory animus. Because Plaintiffs have raised facts sufficient to question whether Wheeling's enforcement of its Zoning Code was merely a

device to force mentally disabled adults to live elsewhere, Wheeling's denial of PhilHaven is not entitled to deference. Therefore, this element also weighs in favor of the finding of disparate impact.

Fourth, and finally, the Court considers the nature of the relief that Plaintiffs seek. "To require a defendant to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing is a massive judicial intrusion on private autonomy." *Metro. Hous. Dev. Corp.*, 558 F.2d at 1293. However, "the courts are far more willing to prohibit even nonintentional action by the state which interferes with an individual's plan to use his own land to provide integrated housing." *Id.*

In this case, Daveri will own the land on which PhilHaven is to be built. Daveri does not ask for any affirmative help from Wheeling to construct PhilHaven. Daveri merely seeks Wheeling's approval of PhilHaven as a multi-family dwelling so that it can be built in an R-4 zoning district. Put another way, Daveri seeks to enjoin Wheeling from interfering with its plans to provide housing for mentally disabled persons who are capable of independent living and that integrates them with the broader residential community. This factor favors Plaintiffs.

As the above analysis shows, Plaintiffs have presented evidence that Wheeling's denial of Daveri's application has a discriminatory impact that violates the FHAA, ADA and Rehabilitation Act. The Village is acting pursuant to a legitimate grant of authority, but there is evidence that it acted with a discriminatory intent. Furthermore, Daveri is seeking to pursue the Congressional goal of integrating housing for disabled persons among nondisabled persons within Wheeling and is asking that Wheeling not interfere with its efforts. The Court holds that, overall, the four factors demonstrate that Plaintiffs have a better than negligible likelihood of success on the merits of their disparate impact claim.

## D.    Reasonable Accommodation

Next, Plaintiffs argue that the Rehabilitation Act, the ADA, and the provisions and regulations of the FHAA prohibit Wheeling from enforcing its Zoning Code in a manner that discriminates against the mentally disabled. For a thorough explanation of the origins of reasonable accommodation claims under the FHAA, the ADA, and the Rehabilitation Act, see *Wisconsin Community Services, Inc. v. City of Milwaukee*, 465 F.3d at 746-53. "All three statutory schemes embrace the concept that, in certain instances, the policies and practices of covered entities must be modified to accommodate the needs of the disabled." *Id.* at 746.

"[T]he Supreme Court has located a duty to accommodate in the [Rehabilitation Act] generally." *Id.* at 747 (citing *Alexander v. Choate*, 469 U.S. 287 (1985)). With regard to a reasonable accommodation claim under the Rehabilitation Act, the statute "helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits 'by reason of' their disabilities, and not because of some quality that they share generally with the public." *Id.* at 748.

To succeed in a reasonable accommodation claim under the FHAA, a plaintiff must first establish that the requested accommodation is reasonable, which is a "highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs*, 300 F.3d at 784 (internal citations omitted). "An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it." *Id.* "In the zoning context, a municipality may show that a modification to its policy is unreasonable if it is so at odds with the purpose behind the rule that it would be a fundamental and unreasonable change." *Wisc. Comm'y Servs.*, 465 F.3d at 749. Second, a plaintiff must establish that the requested accommodation is necessary, "meaning that, without the accommodation, the plaintiff will be

denied an equal opportunity to obtain the housing of her choice." *Id.* "[I]f the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be 'necessary.'" *Id.* n.5 (quotation omitted).

In order to establish a reasonable accommodation claim under the ADA and its regulations in the context of a municipal zoning dispute, a plaintiff must prove that: (1) a modification of the enforcement of a local government's zoning code is necessary because plaintiff's disability is what causes his deprivation of the activities, services, or benefits desired; and (2) such modification is reasonable in that it is "both efficacious and proportional to the costs to implement it." *Id.* at 751-52. If plaintiff succeeds in establishing these elements, a defendant "may show that a modification to its policy is unreasonable if it is so at odds with the purpose behind the rule that it would be a fundamental and unreasonable change." *Id.* at 752 (quotation omitted). "[I]t is necessary that the court take into consideration all of the costs to both parties." *Id.* However, in analyzing reasonableness, a court does not "owe[] special deference to the City's zoning ordinance." *Id.* n.12.

Plaintiffs have established a likelihood that they will be able to show that the accommodation is necessary. Plaintiffs sought to have PhilHaven approved by the Board as a multi-family dwelling because it is "[a] building containing three (3) or more dwelling units whose residents live independently of one another." (*See* Joint Ex. A, Zoning Code, Ch. 19-01.) The Board refused to do so because it assumed that mentally disabled persons are incapable of living independently due to the fact that they may need social services, such as a case worker and other services. Wheeling refused to approve PhilHaven as a multi-family dwelling despite the fact that each tenant would lease his or her own apartment, privately arrange his or her own services, and arrange his or her own transportation to and from such services. Defendant has

provided no evidence to show that the tenants of PhilHaven would not "live independently of one another."

Defendant nevertheless argues that each and every disabled tenant will have a case manager and a treatment plan and that this commonality makes them sufficiently connected to preclude PhilHaven from qualifying as a multi-family dwelling. But, if such a hub-and-spoke relationship, in and of itself, were sufficient to preclude an otherwise-qualified dwelling from being a multi-family dwelling, then an apartment complex where all the tenants are given the privilege of a membership at a nearby health club or a condominium building where all the tenants are members of a common condominium association would not qualify as well. The primary difference between these examples (which are multi-family dwellings) and PhilHaven (which Wheeling has determined is not) is that the residents of PhilHaven are mentally disabled and their commonality relates directly to their disability. Such a distinction is not permissible.

The distinction, however, is critical here. If PhilHaven is deemed a multi-family dwelling, it may be located in a R-4 residential neighborhood. If not, PhilHaven will be shunted to zoning districts with primarily business offices and industrial buildings, assuming that Daveri can obtain a special use permit from Wheeling to build in such districts. Plaintiffs have established a likelihood of success in showing that a modification of the enforcement of Wheeling's Zoning Code to accept PhilHaven as a multi-family dwelling is necessary, because (1) Plaintiffs' deprivation is based on PhilHaven's tenants' mentally disability, and (2) the accommodation would provide the mentally disabled the opportunity to live in the community of their choice.

Plaintiffs have also established a likelihood of showing that the accommodation is reasonable. "An accommodation is unreasonable if it imposes undue financial or administrative

burdens or requires a fundamental alteration in the nature of the program." *Oconomowoc Residential Programs*, 300 F.3d at 784.

Plaintiffs have shown that the benefits to Wheeling, in the event that Daveri's application is approved, will outweigh any financial or administrative costs. Because PhilHaven is not tax-exempt, it would contribute more to the Village's tax rolls than the vacant property that now exists in the proposed PhilHaven location. When Trustee Argiris was asked, "In fact, if PhilHaven was permitted at the Hintz Road site, wouldn't that generate more taxes for Wheeling over what's being received right now?" he answered, "It is irrelevant." (Argiris Dep. at 30.) Further, when Trustee Argiris was asked whether there would be any costs to Wheeling if it allowed PhilHaven to build on Hintz Road in an R-4 residential district, he did not state that there were any such costs and instead responded, "It's all regarding zoning." (*Id.*)

In its submissions, Defendant likewise repeats its mantra that accepting PhilHaven as a multi-family dwelling does not comport with Wheeling's Zoning Code. Presumably, Defendant's argument is that Plaintiffs' request for a reasonable accommodation is unreasonable, because it is so at odds with the purpose behind the creation of the R-4 district that it would be a fundamental and unreasonable change. The Court disagrees.

The R-4 Multiple-family residential district was established to stabilize and conserve existing neighborhoods that predominantly consist of multiple-family dwellings built at moderate to high density. (Joint Ex. A, Zoning Code, Ch. 19.04.060.) Again, a multi-family dwelling is defined as "[a] building containing three (3) or more dwelling units whose residents live independently of one another." (*See* Joint Ex. A, Zoning Code, Ch. 19-01.) Plaintiffs have established that PhilHaven is designed with a lower density than a previously approved housing development at the same location. (2/19/13 Hr'g Tr. at 241.) In addition, as discussed above,

the fact that PhilHaven residents will arrange their own case management and social services does not make them live any less independently of one another. Thus, PhilHaven's proposed density as a multi-family dwelling does not represent a fundamental and unreasonable change to the purpose of the R-4 residential district. Additionally, there is no indication that PhilHaven would harm the stability or nature of the existing neighborhoods such that it egregiously conflicts with the purpose of the R-4 district. Any indication that PhilHaven would destabilize and negatively impact existing neighborhoods primarily came from certain residents at the hearing who voiced their concerns about the project based upon general stereotypes, fears and prejudices. By definition, PhilHaven's tenants will be capable of living independently. The fact that Ellerman and Cripe already reside in independent apartments as part of their transitional living programs only supports this conclusion.

The Court holds that Plaintiffs have established that there is a likelihood that they will be able to show that the accommodation they seek is both necessary and reasonable. In sum, Plaintiffs are able to show that they have a better than negligible chance of succeeding in their reasonable accommodation claim under the FHAA, the ADA, and the Rehabilitation Act.

## II.     Irreparable Harm and Inadequate Legal Remedy

As an initial matter, Plaintiffs argue that in cases where a statute, such as the FHAA, permits injunctive relief, irreparable harm is presumed if there is a likelihood of success on the merits. In support, Plaintiffs rely on the Seventh Circuit's decision in *Illinois Bell Telephone Co. v. Illinois Commerce Commission*, 740 F.2d 566, 571 (7th Cir. 1984), and the Eleventh Circuit's decision in *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir. 1984). However, the Seventh and Eleventh Circuits have subsequently emphasized that "unless a statute clearly mandates injunctive relief for a particular set of circumstances, the courts are to employ

traditional equitable considerations (including irreparable harm) in deciding whether to grant such relief." *Bedrossian v. Northwestern Mem. Hosp.*, 409 F.3d 840, 843 (7th Cir. 2005); *see C.B. v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 261 Fed. Appx. 192, 194 (11th Cir. 2008) (quoting *Bedrossian*, 409 F.3d at 843). In so emphasizing, both Circuits have adhered to the principle as stated by the Supreme Court in *Weinberger v. Romero-Barcelo*, 456 U.S 305, 313 (1982) (quotation omitted): "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."

The pertinent language of the FHAA provides:

> if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, *may grant as relief, as the court deems appropriate*, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1)(d) (emphasis added). The FHAA's use of the language "may grant as relief, as the court deems appropriate" is not the kind of mandate required to scotch this Court's ability to employ traditional equitable considerations. Furthermore, the enactment of the FHAA, in and of itself, does not create a necessary and inescapable inference that restricts the Court's equitable powers. Accordingly, the Court holds that the FHAA does not require a presumption of irreparable harm and an FHAA plaintiff must establish irreparable harm in order to obtain a preliminary injunction under generally recognized principles.

Unfortunately for Plaintiffs, without this presumption, the record fails to establish the threshold requirement of irreparable harm. As for Daveri, it intends to finance PhilHaven primarily through low-income housing tax credits, in addition to low-interest rate loans, a private

mortgage, and several grants. (2/15/13 Hr'g Tr. 7.) Each year, the IHDA disburses these credits in two rounds. (Pls.' Ex. D, 2/1/13 IHDA Letter.) If Daveri does not receive a zoning approval letter for PhilHaven from Wheeling to include in its final application by March 22, 2013 (the deadline for the first round of disbursements in 2013), there will be a second round of disbursements later in the year. Additionally, as Plaintiffs concede, if Daveri does not succeed in obtaining tax credits for the PhilHaven project this year, Daveri can submit an application next year. Moreover, Plaintiffs have presented no evidence that there are other prospective buyers for the Hintz Road site such that it will not be available this year or next. Thus, the only harm facing Daveri, if the preliminary injunction does not issue, is delay in obtaining funding for the PhilHaven project. Such a delay, in and of itself, is insufficient to constitute irreparable harm and is compensable with damages and traditional legal remedies.

Furthermore, it is unclear what harm will befall Task Force should the preliminary injunction fail to issue because Plaintiffs do not address any harm, let alone irreparable harm, that Task Force will suffer. Based on the record before the Court, it cannot find that Task Force faces any irreparable harm.

Lastly, Plaintiffs have failed to establish that Ellerman and Cripe will face irreparable harm in the interim period prior to final resolution of the merits of this case. There is evidence in the record that Ellerman and Cripe will have to find new housing in August 2013 and October 2013, respectively. The Court is sympathetic to the challenges that these individuals may face in obtaining housing after their current residential circumstances come to an end. However, even if the Court were to issue the preliminary injunction today, Ellerman and Cripe's situations would not change because they would still need to find a place to reside until PhilHaven is financed and built. To that point, Plaintiffs have not demonstrated what harm, if any, these individuals will

suffer if they had to reside temporarily elsewhere until the promise of PhilHaven comes to fruition.

In sum, the Court holds that Plaintiffs have established the first threshold requirement of showing that they have a better than negligible chance of success on the merits in pursuing their FHAA, ADA, and Rehabilitation Act claims. However, Plaintiffs have not satisfied the second and third threshold requirements in that they have not shown that they will suffer irreparable harm and they have an inadequate remedy at law. Accordingly, the Court denies the motion for preliminary injunction at the threshold phase and need not address the balancing phase.

### Conclusion

For the reasons provided in this Memorandum Opinion and Order, the Court denies plaintiffs' motion for preliminary injunction [doc. no. 14]. At the next status hearing, the Court will set this case on an expedited trial schedule.

**SO ORDERED**  ENTER: *March 21, 2013*

JOHN Z. LEE
**U.S. District Judge**